The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. I call up the first case for argument today, which is 19-2215 Kodo Kaisha IP Bridge 1 v. TCL Communications Technology. Mr. Nielsen, whenever you're ready. Yes, Your Honor. Good morning and may it please the Court. Much of the briefing in this appeal has centered on two legal principles that, before I got involved in this case, I would have thought to be true. This Court recognized a relatively narrow exception to the settled rule of how one proves literal infringement in a patent case. It held that if the District Court construes the claims and finds the reach of the claims includes any device that practices a standard, then this can be sufficient for a finding of infringement. And this was its express holding. So that's an exacting threshold that must be met for this alternative to the general rule for proving literal infringement to be available. But, Counsel, don't we need to read that language in Fujitsu in context? I mean, it was considering a summary judgment conclusion, was it not? Well, Your Honor, if one actually looks at the decisions of the District Court, the context is completely consistent with the language of Fujitsu's holdings. There was what the District Court described as a first summary judgment ruling in which it invited the plaintiffs, Phillips, Elge, and Fujitsu, to prove that their patents, in fact, were standard essential in the way Fujitsu complicated, that they were necessary to be practiced. And the Court expressly said that this was a matter where there were no pertinent facts except for the language used in the standards and the patents. The only dispute was how the pertinent language should be interpreted. In other words, it was a claim construction exercise. And the Supreme Court in Teva said, even when a claim construction involves subsidiary issues or underlying issues of fact, it's still exclusively for the Court. It's not for the jury. Let me just follow up on that, sir. The language in Fujitsu that I have, the language I've taken out is saying an accused product operates when, where an accused product operates in accordance with a standard, and comparing the claims to that standard is the same as comparing the claims to the accused product. Now, we all know it's unquestionably the jury's duty to compare the claim to the accused product. So why does it necessarily follow that it's also the jury's duty to compare the claims to a standard, considering Fujitsu instructs us that the two inquiries are the same? Well, because Fujitsu makes clear that it's not just enough that a patent has portions or limitations that reflect a standard. It has to be shown that only in situations where a patent covers, in other words, its coverage, its scope, every possible implementation of a standard, will it be enough to prove infringement by showing standard compliance? Counsel, I don't recall your making a showing or a representation that the result would be different if Fujitsu were not applied. You're just saying that as a matter of law, the fact that there was an instruction relying on Fujitsu, that that ends it? No. In fact, Your Honor, we very expressly argue that once Fujitsu, once that analysis, which was used here as a shortcut to prove literal infringement, once one steps beyond that and tries to look at the actual evidence, then there was not sufficient evidence of literal infringement. With respect to the first patent, there is a limitation in that Well, that's where you encounter the question of what was before the jury and whether it was pointed out to the jury that the evidence was inadequate or balanced or whatever else might have diminished its probative value. So would you touch on the jury role, please? With respect to the 239 patent, the one that I was just discussing, it was TCL's primary argument and really almost its sole argument that this particular requirement in the claim was not present in the standard and was not practiced in the source code. We moved for summary judgment on that basis, we argued at trial, and we argued it in JMAL. But what you didn't need to do it. It was like checking the other side of a coin once you flipped it. But the problem is that the claim originally had just a single set of checks. And this second conditional check, the final requirement in the claim to determine whether to send this CQI report with data was added at the insistence of the examiner. The examiner said, look, the prior art, the Shen reference, already discloses sending a CQI report by itself after checking these three conditions. But you didn't bring up prosecution history issues at the claim construction stage, did you? No, because it was our position, Your Honor, that this is the express language of the claim. We're not imposing an interpretation on the claim. We're saying this is an express element of the claim and the plain language of the claim does not read on the accused product. Well, if you're needing to rely on prosecution history to understand the claim, that is quintessential claim construction, is it not? I would disagree, Your Honor, in this instance. In this instance, we're saying to, we said to the judge and the jury, you cannot disregard an express element of the court or the jury, and certainly not the jury, to interpret the claim. We're saying apply the language of the claim and if you do, there can be no infringement because, in fact, IP Bridge and its expert, Dr. Min, relied on precisely the same source code to prove the first affirmative check on which it relied to prove the second check. So you're asking us, counsel, to conclude that no reasonable jury could reach the conclusion that that limitation was not essential to the claim? Well, as a matter of law, the limitation is essential to the claim. We're asking this court to agree with us that there was no evidence that the limitation actually was found in the accused products because there was none. But as a matter of law, each element of a claim is essential. So with respect to the second patent, the 538 patent, if the court agrees with TCL that this Fujitsu theory of literal infringement was wrong, and let me just step back, there's some suggestion that this Fujitsu is not the only authority on which IP Bridge is relying. And then there's some citations to Erickson, JVC, Broadcom, Dynacor, but none of these cases ever upheld a determination of infringement based on evidence that the asserted patent was standard essential and the product complied with the standard. None of them did. Infringement was only upheld in Erickson and it was based on actual evidence of how the products worked when tested. And Erickson said to prove literal infringement, the patentee must show that the accused products contain each and every limitation of the asserted claims. So moving to the 538 patent, if the court agrees with us that Fujitsu didn't apply here because the court never made the required threshold determination as a matter of claim construction, that the patents were necessary to implement the standard, then if you look at the other evidence, the actual infringement. Claim 14 requires selecting an orthogonal sequence from a plurality of orthogonal sequences. And Dr. Min, IP Bridge's expert, never, ever took two sequences of code and showed that they were orthogonal to each other. He didn't even try to do that. The only source code identified by IP Bridge for selecting among a plurality of orthogonal sequences is on page 41 of our brief. And the first three lines, which have the two slash marks in front of them, are not source code. They're comments. Dr. Min's entire testimony on this issue, which IP Bridge now says was the real issue for the jury, is on two pages of the appendix, 13175 and 76. And in those pages, Dr. Min doesn't even discuss or explain the source code. He just talks about the numbers in the comments and says, well, the code does exactly what the comments say. But here, the key testimony was from the Qualcomm engineers themselves. And the Qualcomm engineer who actually wrote this code, who was responsible for testifying, he said that the code doesn't do what the comments say, that they can't be mapped to one another, that there's no correspondence between them. But there is expert testimony to the contrary, is there not? So I've just pointed you to the only testimony from Dr. Min on his direct, two pages, where he doesn't even discuss the code. On redirect, and this is at page 13191, there are two lines of testimony in which Dr. Min agrees with this. Yes, it's appendix 13191, two lines of testimony on redirect. When Dr. Min agrees with his counsel that you could substitute certain values in the code to match up with a 1 and a negative 1. But he actually gets the reverse of what's in the standard. So even there he wasn't consistent. And that's it. Two lines of testimony. Didn't Dr. Wicker agree that the devices wouldn't work if they didn't actually use the plus 1, minus 1 sequence? No. What Dr. Wicker said is, if this is the code, there must be something else. So that's an operability opinion, that assertion depends upon IP Bridge having found the correct code. Or found the only code involved in this process of reducing interference between these two kinds of signals. But Dr. Wicker is saying it's possible and likely that elsewhere in the code there's a mapping that goes along to keep this process working. But that's not literal infringement. That's not what's required by the claim and it's not what was identified by IP Bridge as proof of infringement. Whether there is some way to achieve the same function by mapping this code to some other code is a question of equivalence, which wasn't ever even asserted in this case. So unless there are further questions on the infringement issue, let me just discuss briefly the ongoing royalty issue, because I believe that I'm approaching the time for rebuttal. If the court agrees with us that IP Bridge's Fujitsu theory was wrong as a matter of law, but it somehow determines that there was sufficient evidence of literal infringement for one of these two patents, then the ongoing royalty award for non-accused products must be eliminated. It must be reversed. Assume for the moment that we don't agree with you, your reading of Fujitsu. One of the questions I have for you about the ongoing royalties is the – well, there are two different arguments you make. One is about eBay, but the other is that it should not cover non-accused products. And this may be – excuse my ignorance if I don't completely understand, but the language the court used was any TCL product capable of connecting to an LTE network. Yes. Is it possible that a product could connect to an LTE network and still not practice the standard? Well, we in fact know that for the reasons that I just discussed with respect to the 538 patent, that Qualcomm engineers didn't base the code, didn't base how their processors work on the standard. They didn't read the standard when they coded. They didn't design it. But you didn't really answer my question. Okay. Assuming the standard is what it is, forget about whether they read it or when they coded, is it possible to connect to an LTE network without practicing the standard? Well, for the reasons that I just was describing with respect to the 538 patent, it apparently was. The particular portion of the LTE standard that was relied on was not demonstrated to be present in the accused product. Okay. So you're saying your products do not practice the standard, none of your products? So the vast majority of the standard is practiced by the products. They are LTE compliant in almost every respect. But the proof here did not show these specific patents were literally infringed. That said, the real mischief in the court's ongoing royalty award is that TIVO requires an analysis of the colorable differences, the modified elements of the newly accused product against the asserted claim. And these are accused products that in large part don't even exist. So there is no analysis of the differences between any of these potential accused products. Potentially they could have different source code, different baseband processors, different manufacturers, but they're already subject to the court's ongoing royalties. Well, is there a difference between saying any TCL product capable of connecting to an LTE network and saying any product that is not different in kind from the accused products? Well, I think that this court... Not colorably different. I think this court's requirement in TIVO requires more than broad and sort of generalized assertions of similarity between products for them to be subject to what is essentially... Well, the not colorably different language has been endorsed by us repeatedly. Yeah. My question to you is there a difference between not colorably different and capable of connecting to an LTE network? So, and I don't mean to misunderstand, Your Honor. To the extent that one accepts the premise that the district court did in its post-trial order that every product that connects to an LTE network infringes these patents, then there is not a real difference. There would be no colorable difference. You're still not answering my question. I'm sorry, Your Honor. All right. Go on. Yeah. Let me take one more stab at it before I go further into my rebuttal time. If these products are in fact necessary, as the district court concluded after the jury's between them and other LTE compliant products, they would all be the same in that respect. Okay. Does that answer? Yeah. Why don't we reserve the remainder of your rebuttal, sir, and we'll hear from the other side. Thank you, Your Honor. Thank you. Thank you, Your Honor. May it please the court. My name is Kevin Post, and I represent Plaintiff F. L. E. Godo-Kaisha IP Bridge 1 in this case. I'd like to be sure to answer, Judge O'Malley, your question about connections, but before I talk about the ongoing royalty portion of the court's decision, I would like to return to the infringement question and make a few comments in particular. Well, can I interrupt for a moment just to make sure this is included in your comments, which is that you can give us any other transcript sites than your friend did with regard to the testimony that are less conclusory or more fulsome with regard to Dr. Mintz and Ricker. Certainly, Your Honor. So, obviously, this is a case about standard essential patents and standards-based infringement proof, and TCL referred to another case that's important in this regard, and that is the Erickson decision. And I do want to clarify one point that counsel made. In that case, there was precisely the type of consideration that we had here by the jury of standards-based evidence and evidence of compliance, and I would direct the court to the site of 773 Fed Third 1221, where this court was discussing that evidence. In other words, it was evidence that the claims covered mandatory portions of their 802.11 standard, and that the product complied with that standard. And the court said that this is precisely the type of factual dispute that the jury should be resolving, again, at 1221. That's what happened here. The jury was presented with substantial evidence in the form of expert testimony from Dr. Mintz as to step one. He testified how each claim element was present in the standard. He walked through the standard in great detail. He showed the jury the drafting instructions of the standard, which say, when the standard uses these words, like is and shall, that's mandatory. That means you must do these things. They are not optional. And he testified expressly that there's no way to implement the LTE standard without practicing each of these claims. And all of that testimony and evidentiary support is summarized in the red brief at pages 11 to 12. In response to that, TCL's expert, Dr. Wicker, testified simply that he didn't address those questions. He had no opinion in response to Dr. Mintz. And that appears at the appendix at page 13300. As to step two, again, Dr. Mintz testified... Regarding what? Regarding essentiality? That's correct, Your Honor. He had no opinion in response to what Dr. Mintz said is clear evidence of the mandatory nature of the claims. He understood his argument. He just didn't respond. And he did the same with respect to step two. Again, where Dr. Mintz stepped through and showed compliance by TCL's LTE products of the compliance matrices. He showed compliance reports. He showed TCL user manuals saying these are LTE devices. This is what the device will do when it's connected to and on an LTE network. And perhaps he actually foresaw that there was a missing step, perhaps a step too much, that anything that meets the standard, no matter how different, no matter how creative, no matter how technologically changed, nonetheless infringes, perhaps that's a position that he wasn't quite ready to adopt. And in a sense, that's what's being presented to us, is it not? That there's a step that for infringement does have to be performed. And in Fujitsu, on the technology of that case, it didn't present an issue. Here we're told that there are differences and that there is an issue. Do you share the view that Fujitsu in principle is wrong and should be repealed somehow or shouldn't apply? Or what do we make of these, how to apply these apparently somewhat different facts to the precedent that we have? Certainly, Your Honor. Absolutely not do we disagree with Fujitsu. We think that that's absolutely a correct statement. It's good public policy, as that case acknowledges, to have, if you have identically operating products that practice a mandatory portion of the standard, absolutely you should be able to use the standard to show infringement. Or if identically operating, that's entirely the question, is it not? That these are different. Absolutely, the question of identically operating. Again, Dr. Wicker, TCL has never disputed that its products are LTE compliant. They have compliance matrices they advertise to their customers that these are LTE devices. Its own expert never addressed the question of compliance, had no opinion. Again, that's at 13-300. And that's important because Dr. Wicker admitted, both in deposition and at trial, that this is one way, that showing that claims cover mandatory functionality in the standard and that the products comply. But that's one way to show infringement. He said that at Appendix 13-299. So he understood the test and he did not respond to Dr. Min's extensive opinion. No mystery what IP Bridges' infringement proof was going to be. It had been their theory all along. Originally, at summary judgment, TCL's position was, you can't look at the standard. The only thing that matters is source code. Set aside Fujitsu. Now it's more nuanced. If you invoke Fujitsu, you have to have the court, as part of claim construction, consider a mountain of extrinsic evidence and somehow construe the claims to cover the standard. But that didn't happen in Fujitsu. As the panel noticed earlier, that was a descriptive statement of that case, reflective of its procedural posture. It wasn't a prescriptive rule that must be followed in every case. It hasn't been. It wasn't what the court in the Erickson case did. There was no essentiality hearing that the judge performed. That factual inquiry of what does the standard describe, that was part of the infringement analysis. The jury performed in that case. That's what the jury did here as well. And that unrebutted expert testimony from IP Bridge is absolutely substantial evidence supporting the infringement verdict here. I'd like to answer, Judge O'Malley, your question about whether connection, what the evidence in the record about connection in terms of the ongoing royalty is. And there are several different references to connection, one of which, in fact, is an undisputed fact. And this appears at Appendix 13147. And the fact, this was read to the jury, is, quote, each of the accused products is capable of connecting to an LTE network in the United States. Dr. Min also testified at Appendix 13160 that connection to the network, you must use the technology that you can't connect without being compliant. He also testified at Appendix 13176. And, again, Dr. Wicker at Appendix 13303 admitted that he was unaware of any LTE base station that could receive a signal. And this is in reference to the 538 patent, these orthogonal codes, that was spread using anything other than the code in the table. The base station, it knows what it needs to receive. It needs to receive orthogonal sequences. And those sequences are the ones that are in the standard, that the standard calls them orthogonal sequences in the table. And those sequences, of course, appear on page 41 of the blue brief that was careful about confidentiality, but it appears there as well. And we know that the devices work in the system. At trial, when TCL presented their theory of what the devices are actually storing, which you've heard today, they started and used some of that in the opening statement. And Dr. Min addressed specifically that argument and said, if these devices are doing what TCL tells you they're doing, they won't work. The system simply cannot receive those signals. And Dr. Min testified that way at Appendix 13176. Later, when TCL raised that same argument, its own expert, Dr. Wicker, they actually removed a piece of that argument. They had presented three sequences, one of which was all zeros. That disappeared from Dr. Wicker's testimony. He only talked about other ones. And we never saw that piece again because Dr. Min had shown that if these devices were doing what they're now saying they do, a third of the time, they'd never work. And that's obviously not what we see. So what we know from the standard is you must do this spreading operation this way. The standard dictates precisely how that is. The products are indisputably compliant with the LT standard. Dr. Wicker doesn't dispute it. TCL has still never disputed it. And we know that... So your answer then to my question about whether or not that's capable of connecting and not colorably different are essentially two different ways to say the same thing is your answer to that question would be yes. Absolutely, Your Honor, yes. That here, for this technology, for these standards, and for this evidence and compliance, connection to the LT network shows not that they're just not colorably different. They're the same. They may be different suppliers. There may be different firmware that is used on these devices. But they must practice this technology this way. The standard tells them that. And they do that. And they're compliant. So it really is that they are identical, not just not colorably different in this case. I'd like to touch on one point that counsel raised going back to the question of infringement on the 239 patent. This is the one where the counsel was referring to the second set of checks. This was not a... There was no claim construction dispute about a second set of checks that was raised by Dr. Min did testify that there is no second set of checks. What the claims are directed to are transmissions, not checks. And direct your attention to page 7 of the red brief where the claim language is laid out. And we've annotated there where the checks are in the claims. And what you'll see when you look at those is that they are the same. And there are two elements here. One of which, the first one, is a circumstance where if conditions are such that, say, the channel is bad or it's low quality or you only have a small amount of channel with which to send data, the device should transmit just this little bit of information about the channel quality. It should send only a channel quality report or a CQI report. But if the channel is better or it has more space, it can send that CQI report along with data. And that's the element that was added during prosecution after an interview with the examiner. This was something that wasn't called out in the prior order of record. It was added. It changed the scope of the claim for sure. But what you see is that the checks that are used to determine whether I'm in this CQI-only mode, I'm going to send transmission one, or I'm in the mode of I'm going to send CQI and data. Those checks are the same. The first is whether the device is even supposed to send CQI. It's a single set. That's check one. Check two is the same. What is the value of the MCS index? Is it the value that says I send CQI only or is it a different value? Again, these are what Dr. Min described as the opposite sides of the same check. You either get one result or the other. It's like a coin flip. That's when he told the jury at Appendix 13-165. But those first two checks are the same. The result is absolutely different, but the check is the same. And it's also true of the third where the device is looking at the number of resource blocks that are allocated to it. Is it less than the threshold or is it greater than the threshold? Both sides of that coin. So absolutely there are three checks. There were always three checks in the claims. Those are the checks that Dr. Min testified about. The amendment to the claim didn't add another set of checks. What it set forth is a different transmission. That if you end up with a different result on those checks, then you send CQI and data. That was not disclosed in the Shen reference. It was added and the claim issued. So this is probably why this wasn't a disputed issue with claim construction. The claim is clear. Dr. Min testified about the claim, showed the jury why the claim is infringed, why the standard sets forth this requirement, why the products are compliant. And, again, that is substantial evidence here. I'll ask my colleagues if they have anything further. No. Well, just to be sure that I understand your argument, it's that even if Fujitsu was being stretched or strained, there was enough evidence of a direct relationship between the claims and the accused devices so that this interim question was not controlling. Is that a position you're taking? Your Honor, that's correct. If this court believes that there needs to be a judicial determination of Step 1, if it takes that question away from the jury, that there is evidence here, sufficient evidence to sustain the verdict. And, in fact, I would point you to the court's own determination in the context of ongoing royalty. The court evaluated there. We talked about that here there's no difference, in fact, between connection and no culpable differences between the devices. The court evaluated that evidence and determined that there was sufficient proof of the mandatory nature of the claims and the compliance to utilize that very same test in establishing the ongoing royalty. So even if that is a requirement that this court believes must be met, it was met here. And, Your Honor, if there's no further questions, I thank you for your time. Thank you. For rebuttal, we'll restore your original four minutes because you've got a number of questions. Thank you, Your Honor. So I just want to go through some of the points that opposing counsel made. With respect to the Erickson case, the Erickson case only upheld one finding of infringement by the trial court, and that was based on testing. That's a 12-15 and 12-16 of that decision. It was based on tests that showed the accused devices could practice this functionality. The language that was quoted by opposing counsel had to do with a separate patent, and there was evidence that presented by the defendant that it only provided one kind of feedback response. And so that was sufficient evidence for the federal circuit, and it was from the defendant, for there to be a finding of potential infringement. So, again, that's 12-20, 12-21, actual evidence. And Erickson said, to prove literal infringement, a patentee must show that the accused device contains each and every limitation or decline. With respect to Dr. Wicker, Dr. Wicker opposed admissions with respect to LTE essentiality. He stated, if it is indeed mandatory, then the device would need to practice that portion. And he explained, and this is at 13308, you can't just assume the premise. You have to show that those are, in fact, the case. So with respect to Dr. Min, I don't believe opposing counsel answered the question that was asked at the outset, which is, is it true that Dr. Min's analysis with respect to the 538 patent was confined to those three pages of the appendix? Again, 13175-76, 13191, and that's because they were. That's the entirety of his analysis of the source code. And the first portion is not an analysis of the source code at all, and the second is just a conclusory assertion. And with respect to his statement, which is in the same pages of the appendix, that the devices wouldn't work if they didn't perform exactly literally in the way claimed in the 538 patent, there is no explanation of that opinion. It's just an ipsa dixit assertion. And we know, in fact, that the devices do work. They did it. They do it in a different way. But the source code that is on page 41, the values on the right-hand side, they're not orthogonal as a matter of mathematics, and we haven't heard yet how they could be. With respect to the 239 patent, there's an assertion in the briefing, and I believe the opposing counsel just mentioned it, that, well, there are checks, but it's a single set of checks, and what was added by this amendment, which requires a check to see whether the MCS index is not a determined value, to check whether the number of resource blocks is not less than or equal to a number, and to see whether that trigger bit is set. Those are specific cases as described in the patent. What was suggested is all that was really added was sending the report with data, the transmission. But the admitted prior art in this patent itself, this is, as I said, column 8, lines 39 to 44 of the 239 patent discloses transmitting an aperiodic CQI report in multiplex mode, and that's what the examiner cited when he required this amendment. So it has to mean more than just sending the report mixed with data. These checks have to mean something, and if they do, there was no infringement proven because IP Bridge relied on exactly the same source code to prove both sets of checks. There is a suggestion, I believe, that we didn't really confront Fujitsu, or TCL didn't confront it until trial, but at summary judgment we made the same points that we've been making through trial and on appeal, which is Fujitsu doesn't apply here because the district court didn't make the threshold determination that as a matter of claim construction, the claims cover, their reach includes every device that practices a standard. Now, why is this such an exacting standard? Because if this occurs, then potential defendants and manufacturers not even involved in the case are implicated, and I think Fujitsu recognized that, and that's exactly why it is required for the court to determine this rather than for a jury to be led by bedrock facts to conclude that any product that complies with the standard must infringe a patent that's been declared standard essential. But didn't your own expert say that he knows of no device that works without practicing a standard? So I'm not sure what admission is being referenced there. Professor Wicker certainly, or Dr. Wicker certainly did say that he didn't analyze essentiality because he was conducting an infringement analysis comparing the claims to the accused product. I believe he did testify that he wasn't aware of source code that didn't match the claim, but that's a negative. He had not been shown any source code other than the source code that Dr. Min himself had identified, and Dr. Wicker said the source code that IP Bridge has identified does not match the claims requirement with respect to the 538 patent. He also testified that the 239 patent is not standard essential. The language I'm looking at is 13303, and it relates to the 538 patent. Yes, and looking at that language, he says that at some point there is a mapping. This is a 1303 that occurs, that could occur, but it's a mapping that I have not seen, and I have not seen any evidence that it exists other than we're storing two values different than the standard. Okay. I think I heard the tone. Did you? I didn't, but I wouldn't be surprised. Okay. Well, let's conclude, therefore, on that note. Okay. Well, thank you very much, Your Honor. And the case is submitted. Thank you, Your Honor. Thank you.